919 F.2d 140
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Wilma HOURSTON, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 90-3058.
 United States Court of Appeals, Sixth Circuit.
 Dec. 3, 1990.
 
 Before KEITH and MILBURN, Circuit Judges, and THOMAS, Senior District Judge.*
 PER CURIAM:
 
 
 1
 Plaintiff-Appellant Wilma Hourston ("Hourston") appeals the summary judgment awarded by the district court affirming the decision of the Secretary of Health and Human Services ("Secretary") to deny her claim for disability insurance benefits. For the reasons that follow, we AFFIRM.
 
 I.
 A.
 
 2
 Hourston filed her first application for disability insurance benefits on September 18, 1979. She alleged a disability due to "asthma" and "deterioration of leg muscles," with an onset date of August 8, 1979. Hourston's request for benefits was denied by letter dated November 9, 1979.
 
 
 3
 On September 10, 1985, Hourston filed a second application for disability insurance benefits, along with an application for supplemental security income. The "disabling condition" listed on this second application is "arthritis," and the onset date is listed as November of 1984. In two separate notices dated March 14, 1986, Hourston's claims for both disability benefits and supplemental security income were denied. Hourston filed a request for reconsideration of the denial of supplemental security income on May 8, 1986, and was notified by letter dated November 18, 1986 of the affirmance of the previous decision denying her claim. In conjunction with an interview by a social security district office employee, another application for benefits was filled out on January 28, 1987. The January 28, 1987 application bears the notation: "Per D.O., this is a duplicate claim and should just be attached to claim filed 9/10/85." The 1987 application lists the disabling condition as "chronic contact dermatitis," with an onset date of September 12, 1985.
 
 
 4
 On January 21, 1987, Hourston filed a request for a hearing. The Administrative Law Judge ("ALJ") held a hearing on May 8, 1987. Hourston's counsel was present at the May 8th hearing, but Hourston herself failed to show up. Nevertheless, testimony of the previously scheduled vocational expert ("VE"), Milton E. Foreman, Ph.D., was taken in her absence. Subsequent hearings were held on December 16, 1987 and February 8, 1988. Both the claimant and the VE testified at the February 8th hearing. At the hearing level, various previously asserted grounds for disability were considered, including "contact dermatitis," personality disorders and alcoholism. On February 25, 1988, the ALJ issued a written decision, denying Hourston's application for benefits. After request for review, the Appeals Council adopted the ALJ's decision as the "final decision of the Secretary."
 
 
 5
 On September 27, 1988, Hourston filed a complaint in federal district court seeking review of the Secretary's denial of benefits. The U.S. Magistrate's Report and Recommendation, filed September 25, 1989, found that the ALJ's decision is supported by substantial evidence. The district court issued an Order on November 20, 1990, finding that the decision of the Secretary of Health and Human Services is supported by substantial evidence. A timely notice of appeal was filed to this court on January 16, 1990.
 
 B.
 
 6
 Hourston was born on May 17, 1941, and was 47 years old on the date of the Secretary's final decision. Hourston testified before the ALJ that she quit school in the 9th grade. The appellant's past relevant work includes various unskilled jobs, such as assembly, sandblasting, laundry, nurse's aide, sanitation worker, and housekeeper. According to testimony before the ALJ, Hourston's last substantial gainful activity was her job at a laundry from approximately July 18, 1985 to December 31, 1985. Accordingly, at the February 8, 1988 hearing appellant's disability onset date was amended to December 31, 1985.
 
 
 7
 The record contains various medical and psychological evaluations, as well as some work evaluations. On November 11, 1985, Hourston underwent a psychiatric evaluation conducted by Stephen Vance, M.D., pursuant to a referral by the Bureau of Disability Determination. Dr. Vance reported that Hourston "readily knows she's an alcoholic," yet despite being encouraged to seek treatment as a result of incidents of excessive drinking subsequent to her stay at Eden House, she has failed to do so. Dr. Vance did state that Hourston tends "to minimize her alcoholism." The report also indicates that appellant was "well dressed and groomed." Dr. Vance reports that Hourston "thought of suicide seriously on only one occasion but had made no plans for attempts." The report makes the following diagnosis:
 
 
 8
 [Hourston] does not show any organic deficit in terms of retention and recall. Her intelligence is certainly within normal limits. Her daily activities seem fairly appropriate except for minimal interpersonal relationships.
 
 
 9
 ... Ms. Hourston did not appear to have difficulty understanding or following simple instruction.... Her attention span was adequate. Her contact with this examiner was pleasant and in general I would doubt if she would have trouble relating to co-workers or supervisors. It would appear that she has trouble with stress or pressure with a tendency to become anxious and turn to alcohol under stress.
 
 
 10
 All of the foregoing supports Dr. Vance's conclusion that, "If under low stress [Hourston] should be capable of routine repetitive activities and varied tasks."
 
 
 11
 David L. Roebker, Ph.D., psychologist, examined Hourston on July 17, 1986 and August 15, 1986 in conjunction with a psychological evaluation. Appellant was referred to Dr. Roebker by her lawyer. During this examination, Hourston "admitted to drinking heavily in the past, but did not feel that that was a problem at the present time." Hourston further stated that, "she stopped heavy drinking in 1982." Dr. Roebker reports that appellant stated, "[S]he would like to work if she could work by herself and not have bad reactions to demands placed upon her." Under the "Clinical Overview" section of his report, Dr. Roebker states that Hourston complained of "insomnia," and that "[s]he does not have people visit her nor does she enjoy visiting other people even her relatives." At the same time, the report also states that Hourston "fixes her own meals, does her own shopping and keeps her apartment clean." Dr. Roebker conducted a battery of psychological tests which he says reveal "low average range intelligence," below average finger and hand dexterity, severe depression and interpersonal problems. Dr. Roebker finds Hourston to be "markedly limited" in the areas of daily living, social functioning, concentration and task persistence, and deterioration and decompensation. Based on the foregoing, Dr. Roebker concludes, "[Hourston] cannot tolerate the stress and pressures associated with day-to-day work activity."
 
 
 12
 A November 7, 1986 "Psychiatric Review" and "Residual Functional Capacity Assessment" by Giovanni Bonds, Ph.D., psychologist, finds appellant to be depressed, but not to such a degree that she is "markedly limited" in areas of daily living, maintaining social functioning, concentration, persistence or pace, and deterioration or decompensation in work or work-like settings.
 
 
 13
 Pursuant to a referral by Hourston's Bureau of Vocational Rehabilitation ("BVR") counselor, Hourston was examined by Robert Brunner, Ph.D. Dr. Brunner's "Psychological Report" states that appellant "has no sleep or appetite problems." The report also states that Hourston "has only been 'dry' for 5 months after being alcohol dependent since her teenage years." Continuing, Dr. Brunner reports, "Jean [Hourston] has felt better since she has been sober and is less 'afraid of people.' " Dr. Brunner also conducted a battery of psychological tests and states that appellant is "functioning in the average range intellectually with commensurate academic skills." Dr. Brunner concludes that Hourston's alcoholism is in remission, and that she "currently appears to be best suited for unskilled labor categories such as food service, factory or housekeeping services." Dr. Brunner also thinks Hourston would benefit from "individual therapy" with regard to her interpersonal problems, and he recommends that she pursue counseling.
 
 
 14
 Also in conjunction with a BVR referral, Hourston underwent a vocational evaluation at Goodwill Industries from November 2, 1987 to November 20, 1987. Of the 15 evaluation days, appellant was present 6 days and absent 9 days. While listing vocational limitations of alcoholism and a mixed personality disorder, the report also states that Hourston "did demonstrate strong skills for Food Services and at present this seems to be the best direction for immediate placement."
 
 
 15
 In her arguments to this court, appellant abandons her previously claimed sources of disability, and asserts a new source:
 
 
 16
 [I]t is conceded that although [Hourston] suffers from other physical problems [in addition to contact dermatitis] including arthritis and carpal tunnel syndrome, none of the physical problems considered singly or in combination disable her from all work activity. Rather, the evidence established that the claimant was disabled as a result of mental impairments diagnosed as a mixed personality disorder and alcoholism.
 
 
 17
 Plaintiff-Appellant's Brief at 3. Apparently, appellant feels that the foregoing statement conforms to the evidence presented to the ALJ. On February 8, 1988, when asked about why she missed the first hearing, Hourston replied,
 
 
 18
 I had trouble. I was sick. I was really, you know--from drinking. My mind was a complete blank, I didn't even remember that I had to come over here until it was too late. And I was sick.
 
 
 19
 Transcript of February 8, 1988 Hearing at 35. Appellant also testified that she was fired from at least two previous jobs because she came to work drunk and got into verbal confrontations with her supervisors.
 
 
 20
 Hourston testified that she does not like to be with people all of the time. As to when she does not like to be with people, Hourston said, "I don't know, people sometimes they just get on my nerves, you know, really. They just--they just make me nervous and tense, I don't understand them, they don't understand me, and I just want to get away from it." Id. at 37. Appellant testified that she "[doesn't] really sleep that good," because she is thinking of lots of different things at night. Id. at 106. In addition, Hourston testified that she has had "plenty" of blackouts from drinking. Id. at 107-08. Although Hourston testified that she did not consciously think about suicide, she mentioned an occasion where she had blacked out and was later told by a security guard that she had made reference to killing herself. Id. at 108.
 
 
 21
 With regard to treatment for her drinking problem, appellant's testimony indicated that while she had started several treatment programs, she always lost interest and withdrew from treatment. Hourston testified that after going to Eden House, she was referred to a half-way house known as Salisbury and Hamilton. Hourston went on to say that she stayed at the half-way house just 19 days. Asked why she didn't stay 90 days, Hourston replied,
 
 
 22
 I just got tired. Got bored, and there wasn't any--I didn't feel like a normal person, not really. I wasn't important to somebody. Why would I stay. Maybe I should have stayed, I don't know. I just wanted to get--try to get back to being my own person, my own boss, like I've always been. You know. My own.
 
 
 23
 Id. at 34. Hourston also testified at the hearing that she was no longer in the Bureau of Vocational Rehabilitation Program because, in her words, "I just can't seem to get along with their things." Id. at 36. Hourston testified that she had gone to Alcoholics Anonymous ("AA") in the past, but had not been to a meeting in several months at the time of the February 8, 1988 hearing. Among her reasons for not going to AA meetings, appellant said, "I didn't want to hear all that, I hear so much bad from everybody." Id. at 106-07, 117.
 
 
 24
 The following hypothetical question was put to the VE at the May 8, 1987 hearing by the ALJ:
 
 
 25
 [ALJ:] Based--if I should give you a hypothetical question in which I assume that this claimant has, in the past, had ... alcohol abuse, she had a long history of that but there is indication in the record that that now seems to be under pretty good control and her--Dr. Penbar sees that she has shown some improvement under that and--then we have a psychological report by Dr. Roker (PHONETIC), who indicates that she has an I.Q. of 83, and he thinks her psychological problem appears to be depression, as well as tending to abuse alcohol.
 
 
 26
 And he finally diagnoses the claimant as having a major depression, with episodic alcohol abuse and dermatitis and other physical complaints that--he seems to think that her stress brings on her alcoholic abuse and probably, may be some relation to her dermatitis.... And so based on that with the premise--and then add to that Dr. Roker (PHONETIC) finally--he's of the opinion that she has poor ability regarding stress and--and her--he thinks in all probability, he says she cannot tolerate stress or pressures associated with day-to-day activity, he says. And then he recommends that she be seen by a psychiatrist. And Dr. Penbar indicates the same thing.
 
 
 27
 Well, she was seen by a psychiatrist. Exhibit 33, Dr. Vance saw her. He indicates that her complaints center around dermatitis--would flare up under stress. Says her drinking problem is under much better control the past four years, and he feels that--that she has--her daily activities are under fairly good control, with the exception of minimal interpersonal relationships. She did not appear to have difficulty understanding or following simple instructions, if under stress. She would be capable to routine, repetitive activities of various tasks. Her attention span would be adequate. So, though, he goes on to say that her--his contact with her was pleasant, and said he'd doubt if she'd have trouble with her co-workers or supervisor. She would appear that she might have trouble with stress or pressure, with a tendency to become anxious and turn to alcohol. But apparently under low-stress jobs, he didn't think that would happen.
 
 
 28
 So that's the evaluation that we get when we refer to the psychiatrist, which indicates that following that line of thinking, that under those circumstances, the--would she be able to engage in a job, do you think?
 
 
 29
 [VE:] Yes, sir. Yes, sir. That would be consistent with Dr. Vance's estimate.
 
 
 30
 Transcript of May 8, 1987 hearing at 12-14. Earlier in this same hearing, the VE suggested various categories of low stress jobs that would be best suited for Hourston. Specifically, the VE mentioned "rough inspection" jobs, of which Dr. Foreman said there were 3400 in Hourston's region. Dr. Foreman described these "rough inspection" jobs as, "title checkers, sorters, examiners, this is classified as unskilled work and, as I say, sixty percent are classified as sedentary, forty percent aren't." Id. at 9.
 
 
 31
 At the February 8, 1988 hearing, Hourston's attorney added the following caveat to the previous hypothetical put to the VE by the ALJ:
 
 
 32
 [ATTY:] The jobs that you've identified previously, if I don't have the exact hypotheticals. If one could assume the individual with the claimant's vocational profile has been previously identified, and that individual, in addition to any of the jobs that were given in response to the prior hypotheticals, if that person wasn't able to follow proper procedures, would be absent and late in the work environment, if the individual had difficulty displaying--interacting with co-workers, if that individual found it difficult, had a very poor ability to accept unpleasant or repetitive tasks, if that person needed improvement in below-competitive standards and work speed, would there be any jobs that person could do?
 
 
 33
 ALJ: In your answer there, is that specific enough?
 
 
 34
 VE: I would think so. Ms. Hourston has worked at unskilled and semi-skilled--positions. If she maintains the attitudes that are conveyed in those items, she would not hold work as her own history indicates.
 
 
 35
 Transcript of February 8, 1988 hearing at 42. The question presented in this appeal is whether or not the Secretary's decision that Hourston is not disabled is supported by substantial evidence.
 
 II.
 
 36
 When reviewing a denial of Social Security benefits, the question is whether or not, reviewing the record as a whole, "the decision of the ALJ and the Appeals Council is supported by substantial evidence." Smith v. Secretary of Health and Human Services, 893 F.2d 106, 108 (6th Cir.1989). The appellate court does not review the decision of the Secretary de novo, and "may not even inquire whether the record could support a decision the other way." Id. The only question is whether substantial evidence supports the Secretary's decision, and substantial evidence is defined as "evidence that a reasonable mind might accept as adequate to support the challenged conclusion. Id. (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).
 
 
 37
 On appeal, appellant Hourston is not relying on any physical conditions to prove disability, but is instead asserting that "a mixed personality disorder and alcoholism" are her disabling conditions. See supra p. 7. This court has held that " 'the mere inability to control alcohol intake is not sufficient to allow for a finding of disability. There must be serious interference with the claimant's normal day-to-day activities.' " Smith v. Secretary of Health and Human Services, 893 F.2d at 110 (quoting LeMaster v. Secretary of Health and Human Services, 802 F.2d 839, 842 (6th Cir.1986)). Reports in the record which detail conversations with Hourston's mother, daughter and at least one friend, along with Hourston's own testimony, are sufficient to support a finding that appellant's day-to-day activities include shopping, cooking, house cleaning, bathing, taking walks and other normal daily activities. Various accounts in the record are in conflict as to Hourston's current status with regard to drinking. Some accounts found Hourston's alcoholism to be in remission, while others did not.
 
 
 38
 The hypothetical questions posed to the VE at the May 8, 1987 and February 8, 1988 hearings before the ALJ are an accepted method for helping to determine a claimant's residual functional capacity. "Substantial evidence of a claimant's residual functional capacity may lie in the testimony of a vocational expert in response to a hypothetical question that 'accurately portrays [the claimant's] individual physical and mental impairments.' " Davis v. Secretary of Health and Human Services, No. 89-6428, slip op. at 5 (6th Cir. August 3, 1990) (citations omitted). When the hypothetical question portraying Hourston's "physical and mental impairments" was presented to the VE at the May 8, 1987 hearing, the VE testified that the appellant is capable of performing various unskilled, low stress jobs, such as "rough inspection," of which 3400 are available in Hourston's region. At the February 8, 1988 hearing, Hourston's attorney modified the hypothetical question by adding characteristics such as inability to follow proper procedures, absenteeism and tardiness, to name a few. Taking these modifications into account, the VE testified that appellant "would not hold work." Subsequent to modification of the hypothetical, the following examination took place between the ALJ and the VE:
 
 
 39
 [ALJ:] At the last hearing, when you were given the hypothetical questions concerning the claimant's ability to work, one of the exhibits that was used was a psychiatric report by Dr. Vance, Steven Vance.... And I used that as a basis of a hypothetical question, and you indicated that the unskilled jobs, some of which were similar to those that she had before, were of low skill--I mean low stress, low-to-average stress. And you indicated that she'd probably be able to do those jobs. Now, whether she wants to do them, or whether she can do them--I don't know whether she wanted to attend this Goodwill, or whether she just walked out. There was no reason given why she walked out. Maybe she didn't want to work, I don't know. But you[r] answer to that question, based on Exhibit 33 [Dr. Vance's Report], is still the same, is it not?
 
 
 40
 [VE:] That's correct.
 
 
 41
 Transcript of February 8, 1988 hearing at 43. During the February 8th hearing the ALJ found that appellant's alcoholism was in remission. Id. at 45.
 
 
 42
 The modifications to the hypothetical by Hourston's attorney really beg the question. It goes without saying that a person who does not follow proper procedures and does not show up for work cannot hold a job. The question, however, is whether or not the appellant is disabled by a physical or mental condition which prevents her from working. With the exception of Dr. Roebker, the psychologist selected by appellant's attorney, the other reports and evaluations of Hourston's condition which address alcohol related problems support a conclusion that Hourston is capable of performing low stress work. Indeed, the ALJ seems to place substantial reliance on the psychiatric evaluation performed by Dr. Stephen Vance, which evaluation concluded that Hourston is "capable of routine repetitive activities and varied tasks," if under low stress. The VE's testimony appears to place substantial reliance on Dr. Vance's evaluation as well. It is true that there is a difference of opinion between Stephen Vance, M.D., a psychiatrist, and David L. Roebker, Ph.D., a psychologist. However, based on the record as a whole, the decision of the ALJ, later adopted by the Appeals Council as the decision of the Secretary, is supported by substantial evidence.[1]
 
 III.
 
 43
 Accordingly, for the aforementioned reasons, the summary judgment of the district court in favor of the Secretary of Health and Human Services is AFFIRMED.
 
 
 
 *
 The Honorable William K. Thomas, United States Senior District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 In Gerst v. Secretary of Health and Human Services, 709 F.2d 1075 (6th Cir.1983), this court concluded, "Gerst failed to show, in summary, any mental, emotional, or personality disturbance type of disorder related to his alcoholism that would establish a disability under Sections 223(d)(1) or 1614(a)(3)(A) of the Social Security Act, or any impairment under 20 C.F.R. Section 404.1517 (1980)." Id. at 1077. The same summary applies to Hourston on the present record